AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>2004 gray Cadillac CTS bearing California license plate 6KXN515 and vehicle identification number 1G6DM577640141623, as described in Attachment A-2 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**FILED**
CLERK, U.S. DISTRICT COURT

**1/26/2023**

CENTRAL DISTRICT OF CALIFORNIA
BY: TRB DEPUTY

Case No.   2:23-mj-00380-DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Bank Robbery |
| 18 U.S.C. § 2113(a) | Bank Robbery |
| 18 U.S.C § 924(c) | Use of a Firearm in Furtherance of a Crime of Violence |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Geoffrey S. Gilliland, Special Agent
*Applicant's signature*

Geoffrey S. Gilliland, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   01/23/2023

*Judge's signature*

City and state: Santa Barbara, CA

Hon. Louise A. LaMothe, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jena A. MacCabe, ext. 5046

## ATTACHMENT A-2

PROPERTY TO BE SEARCHED

The following vehicle (the "Subject Vehicle") that is currently in the custody of the Oxnard Police Department in Oxnard, California: a 2004 gray Cadillac CTS bearing California license plate 6KXN515 and vehicle identification number 1G6DM577640141623, which is registered to DANIEL CALDERON GARCIA.

**ATTACHMENT B**

## I. **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to commit bank robbery), 18 U.S.C. § 2113(a) (bank robbery), 18 U.S.C § 924(c) (use of a firearm in furtherance of a crime of violence), and 18 U.S.C. § 922(g)(1) (felon in possession of a firearm) (the "Subject Offenses"), namely:

     a.    United States currency in excess of $1,000.00;

     b.    Receipts, documents, and/or correspondence relating to Wells Fargo Bank;

     c.    Diagrams, addresses of locations, directions to and from locations, or maps;

     d.    Bank deposit slips, check ledgers, receipts for large case payments or deposits, money order receipts, cashier's checks, or receipts;

     e.    Materials from or belonging to banks, financial institutions, and armored transport services, including, but not limited to, Wells Fargo Bank, such as marked bank or merchant-type bags, cash count documents, plastic cash bags, or money wrappers;

     f.    Devices to count currency;

     g.    Any items of clothing matching the description of the items of clothing worn by the subject described in the affidavit;

h.    Any firearms or any weapons that might be used for an armed robbery as suggested in the note handed to the victim teller and any other illegally possessed firearms;

i.    Any security safes;

j.    Any cellular telephones used or possessed by DANIEL CALDERON GARCIA ("GARCIA"), and any billing statements, receipts, charges, records, or other documents related to those telephones or their use;

k.    Any data of any kind contained in and cellular telephones, computers, or other digital device used or possessed by GARCIA, which constitutes:

i.    Communications between GARCIA and any other potential accomplices;

ii.   Communications related to any of the robberies set forth in the affidavit and/or any proceeds therefrom; and

iii.  Any photographs, videos, or other depictions of GARCIA;

l.    Bank records related to any accounts used, accessed, possessed, or associated with GARCIA;

m.    Documents related to the ownership, possession, custody, control, or use of any property and/or vehicles, including but not limited to the SUBJECT DEVICE and SUBJECT VEHICLE;

n.    Keys to any storage units, lockers, safes, and/or vehicles;

o.    Photographs depicting GARCIA;

p.   Any records, documents, programs, applications, materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from the digital device and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

q.   Any records, documents, programs, applications, or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices, and which relate to the above-named violations;

r.   Any records, documents, programs, applications, or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device, and which relate to the above-named violations;

s.   Audio recordings, pictures, video recordings, or still captured images related to banks, bank hours, interior or exterior of bank buildings, cash, or jewelry or other items purchased with bank robbery proceeds;

t.   Contents of any calendar or date book;

u.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

v.    Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

w.    With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.    evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.    evidence of the times the device was used;

vi.    applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2.     As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II.   **SEARCH PROCEDURE FOR THE SUBJECT DEVICE(S)**

3.     In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.     The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.     The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital device(s) and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return

the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress GARCIA's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICE (only if the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of GARCIA's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Geoffrey S. Gilliland, being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against DANIEL CALDERON GARCIA ("GARCIA") for a violation of 18 U.S.C. § 2113(a): Bank Robbery.

2.   This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE") that is currently in the custody of the Oxnard Police Department in Oxnard, California, as described more fully in Attachment A-1: a silver Apple iPhone in a clear protective hard case with an unknown serial number, which was seized from GARCIA's person on November 21, 2022.

3.   This affidavit is also made in support of an application for a warrant to search the following vehicle (the "SUBJECT VEHICLE") that is currently in the custody of the Oxnard Police Department in Oxnard, California, as described more fully in Attachment A-2: a 2004 gray Cadillac CTS bearing California license plate 6KXN515 and vehicle identification number 1G6DM577640141623, which is registered to GARCIA and was impounded on November 21, 2022.

4.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to commit bank robbery), 18 U.S.C. § 2113(a) (bank robbery), 18 U.S.C § 924(c) (use of a firearm in furtherance of a crime of violence), and 18 U.S.C. § 922(g)(1)

(felon in possession of a firearm) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated herein by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. __BACKGROUND OF AFFIANT__

6.    I am a special agent with the Federal Bureau of Investigation (the "FBI") and have been so employed for the past 17 years.  I am currently assigned to FBI Ventura County Resident Agency.  My responsibilities with the FBI include bank robbery investigations in the Central District of California.  I work in conjunction with investigators from the Oxnard Police Department and the Ventura County Sheriff's Department to investigate bank robberies.

7.    Through the bank robbery and commercial/retail robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data and

reviewing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, to include FBI special agents and local law enforcement detectives with experienced in commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.   On November 21, 2022, at approximately 10:00 a.m., GARCIA robbed a Wells Fargo Bank branch located at 1700 E. Gonzalez Road, Oxnard, California 93063 by pushing deposit envelopes to a teller and a note stating that this is an armed robbery and to give him all the money in $100 bills.  GARCIA took a total of approximately $9,000 in denominations of $100 from Wells Fargo Bank.

9.   After the robbery, GARCIA took off on a bicycle, and a few minutes later, arrived at the Walmart Supercenter located at 2001 N. Rose Ave., Oxnard, California 93036, across the street from the bank.  There, he changed his clothes and stole some items.

10.   At approximately 7:00 p.m. that night, the Oxnard Police Department arrested GARCIA for violating a protective order that his mother had against him.  When police arrested him, GARCIA had $759 and the SUBJECT DEVICE on his person, which police seized.  Nearby, police impounded the SUBJECT VEHICLE, which was registered to GARCIA and parked illegally.

11.   Law enforcement identified GARCIA as the bank robber using a six-pack identification by three eyewitnesses and surveillance footage.

## IV. STATEMENT OF PROBABLE CAUSE

12.   Based on my training and experience, my participation in this investigation, my review of surveillance footage and law enforcement reports, and my conversations with law enforcement officers regarding this investigation, I know the following information:

**A.   GARCIA Robbed Wells Fargo Bank**

13.   According to surveillance video and Oxnard Police Department reports, on November 21, 2022, at approximately 10:00 a.m., a male walked up to a teller station in the Wells Fargo Bank branch in Oxnard, California.  He pushed deposit envelopes to the teller and a note stating that this is an armed robbery and to give him all the money in $100 bills.  The teller handed him approximately $9,000 in $100 denominations, which the bank later confirmed by inventorying its cash.

14.   Multiple witnesses described the suspect as a Hispanic male, with a persistent cough, wearing a COVID-19 face mask, black shorts, and a beanie.  Video surveillance from the bank is consistent with that description.

15.   Video surveillance from businesses surrounding the bank showed the suspect leave the bank, get on a bicycle, and depart the area towards the Walmart Supercenter located at 2001 N. Rose Ave., Oxnard, California 93036, across the street from the bank.

16.   Law enforcement later identified the suspect as GARCIA using surveillance footage and a six-pack identification by three eyewitnesses, as described below.  I also reviewed a certification that at the time of the robbery, the deposits of Wells Fargo Bank were then insured by the Federal Deposit Insurance Corporation.

**B.   After GARCIA Robbed the Bank, GARCIA Biked to the Walmart Supercenter Nearby and Changed His Clothes**

17.   According to witness statements made to police, a few minutes after the bank robbery, GARCIA parked his bicycle at the Walmart Supercenter across the street from the bank.[1]

18.   Two Walmart Supercenter employees saw GARCIA at their store where he displayed the same persistent cough observed at the bank, changed his clothes, and left the store without paying for some items.  The employees attempted to interact with GARCIA while he was at the store, noticed his unusual behavior, and later provided law enforcement descriptions of GARCIA that matched those from the bank and surveillance footage.

19.   According to an Oxnard Police Department report, on the same day as the robbery, law enforcement presented a six pack of photos, including a photo of GARCIA, to two Walmart Supercenter employees.  One employee positively identified GARCIA as the suspect.  The other identified another individual in the six pack as the suspect.

---

[1] Before the bank robbery, GARCIA had purchased and put on a beanie and shirt from the same Walmart Supercenter that he was seen wearing during the bank robbery.

### C. Police Arrested GARCIA for Violating a Protective Order, Seized the SUBJECT DEVICE, and Impounded the SUBJECT VEHICLE

20. According to an Oxnard Police Department report, at approximately 7:00 p.m. on November 21, 2022, several hours after the bank robbery, GARCIA was arrested for an unrelated violation. Specifically, the Oxnard Police Department arrested GARCIA for violating the terms of a protective order that was issued to protect GARCIA's mother against GARCIA. The protective order was issued on April 1, 2022, and expires on April 1, 2025, in the Superior Court for the State of California, County of Ventura, Case Number D404523.

21. Family members had called 911 when they found GARCIA in his mother's residence. GARCIA was booked into custody for violating California Penal Code § 273.6(a) (misdemeanor disobeying a domestic relations court order) and the terms of his parole.

22. When GARCIA was arrested, and in accordance with his parole conditions, police took GARCIA into custody. On GARCIA's person, police found and seized $759 and the SUBJECT DEVICE.

23. Near where GARCIA was arrested, police impounded the SUBJECT VEHICLE for being illegally parked and blocking a private parking space on South Grant Street in Oxnard, California. California Department of Motor Vehicle records show that GARCIA owns, operates, and has registered to himself that SUBJECT VEHICLE.

**D. In the Two Days After the Robbery, the Victim Teller and Another Walmart Supercenter Employee Identified GARCIA in a Six Pack**

24. According to an Oxnard Police Department report, on November 22, 2022, the day after the robbery, law enforcement presented a six pack of photos, including a photo of GARCIA, to another Walmart Supercenter employee, who positively identified GARCIA as the suspect.

25. On November 23, 2022, two days after the robbery, law enforcement presented a six pack of photos, including a photo of GARCIA, to the victim teller from the Wells Fargo Bank branch in Oxnard, California, who positively identified GARCIA as the suspect.

**E. GARCIA Is a Felon**

26. Based on my review of GARCIA'S criminal history, I learned that GARCIA was convicted of the following felony crimes:

a. Second-degree burglary in violation of California Penal Code § 459 on or about January 12, 1998, in the Superior Court for the State of California, County of Ventura, Case Number CR43124;

b. Burglary in violation of California Penal Code § 459 on or about January 26, 1998, in the Superior Court for the State of California, County of Ventura, Case Number CR42945; and

c. Attempted robbery in violation of California Penal Code §§ 644, 211 and forgery (Prop 47) in violation of California Penal Code § 470(d) on or about July 9, 2021, in the

Superior Court for the State of California, County of Ventura, Case Number 2021005468.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

27.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

28.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not

kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a

complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

30.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a

certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an enabled
device may exist for only a short time.  I do not know the
passcodes of the devices likely to be found in the search.

      c.    The person who is in possession of a device or
has the device among his or her belongings is likely a user of
the device.  Thus, the warrant I am applying for would permit law
enforcement personnel to, with respect to any device that appears
to have a biometric sensor and falls within the scope of the
warrant: (1) depress GARCIA's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of GARCIA's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

    31.  In addition to what has been described herein, the
United States has attempted to obtain this data by requesting
consent to search the SUBJECT DEVICE.  The United States has not
received consent to search the SUBJECT DEVICE.

//

//

11

## VI. <u>CONCLUSION</u>

32.   For all the reasons described above, there is probable cause to believe that GARCIA has committed a violation of 18 U.S.C. § 2113(a): Bank Robbery.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A-1 and the SUBJECT VEHICLE described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _26th_ day of
January, 2023.

_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE